**In re BIG V HOLDING CORP.,
et al., Debtors.**

**Big V Supermarkets, Inc.,
et al., Plaintiffs,**

**v.**

**Wakefern Food Corporation,
Defendant.**

**Bankruptcy No. 00–4372(RTL).
Adversary No. 00–1976.**

United States Bankruptcy Court,
D. Delaware.

Sept. 14, 2001.

72

Willkie, Farr & Gallagher, Brian E. O'Connor, Stephen W. Greiner, New York City, Counsel for Plaintiffs.

Cadwalader, Wickersham & Taft, Dennis J. Block, Barry J. Dichter, Kenneth A. Freeling, Jason M. Halper, New York City, Co–Counsel for Defendant, Wakefern Food Corp.

Wilentz, Goldman & Spitzer, Frederick K. Becker, Woodbridge, NJ, Co–Counsel for Defendant, Wakefern Food Corp.

*OPINION*

RAYMOND T. LYONS, Bankruptcy Judge.[1]

## *TABLE OF CONTENTS*

A. INTRODUCTION ................................................76

B. FINDINGS OF FACT ...........................................76
 1. Historical Background ...................................76
 a. Wakefern's Founding ...............................76
 b. Wakefern's Growth .................................77
 c. Big V Joins Wakefern ..............................77
 d. The Pathmark Defection ............................79
 e. The Warehouse Agreement ...........................79
 2. Governing Documents ...................................80
 a. Wakefern Corp. By–Laws ............................80
 b. Stockholders' Agreement ...........................80
 3. Wakefern's Debt Obligations ...........................82
 4. Lee Funds' Side Letter Agreements .....................83
 5. Consolidated Law Suit .................................83
 6. Lee's Liquidation Efforts .............................84
 a. 1996–1998 .........................................84
 b. Big V's Management Shake-up .......................84
 c. Big V's Cash Shortage .............................85
 d. 2000 Sale Efforts: Peter J. Solomon Co ...........85
 e. Tender/Independent Scenario .......................85
 f. C & S Supply Agreement ............................85
 g. April 17, 2000 Board Meeting ......................86
 h. Sale Efforts Continue .............................87
 (i) Millenium Partners/Stockbridge .............88
 (ii) Wakefern .................................88
 (iii) Schwartz/Toopes Management Buyout .........88
 (iv) Pathmark/Royal Ahold/Safeway .............88
 (v) Ceruzzi ...................................88
 7. Bank Group Refuses Consent ............................89
 8. Big V Files Bankruptcy ................................89
 9. Big V's Departure and its Potential Effect on Wakefern ....90

C. DISCUSSION ..................................................90
 1. Principles of Contract Interpretation and Construction ......91
 2. Step Transaction ......................................91
 a. End Result Test ...................................93
 b. Interdependence Test ..............................94
 (i) No Economic Substance ......................95
 (ii) Forfeiture of ShopRite Brand Value .........96
 (iii) Defiance of Bank Group .....................99
 (iv) Sale Efforts Continue ......................99
 c. Binding Commitment Test ...........................100
 d. Summary ...........................................100
 3. Tender/Independent Scenario is Withdrawal .............101
 a. "Sale or Other Disposition" .......................104
 b. Omitted Terms .....................................105
 (i) Big V's Implied Contractual Obligation ......106

**1.** Honorable Raymond T. Lyons, U.S. Bankruptcy Court, District of New Jersey; by assignment to the U.S. Bankruptcy Court, District of Delaware.

 (ii) Other Cooperative Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
 (iii) Implied Covenant of Good Faith and Fair Dealing . . . . . . . . . . . . . . . . . . . 110
 4. Minimum Patronization Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

D. **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

## INTRODUCTION

Plaintiff/debtor, Big V Supermarkets, Inc. ("Big V"), seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201, et seq.[2] against defendant, Wakefern Food Corporation ("Wakefern"). Specifically, plaintiff seeks a declaration that: 1) Big V has the right to tender its shares to Wakefern; 2) Wakefern is required to purchase the shares for approximately $16 million; 3) upon Wakefern's purchase of the shares, the relationship between Big V and Wakefern will be terminated; and lastly 4) Big V will owe no further obligations to Wakefern, including any withdrawal payment or adherence to a minimum patronization requirement under the Wakefern Stockholders' Agreement. The primary issue in this case is whether, pursuant to the Wakefern By–Laws and Stockholders' Agreement, Big V may leave Wakefern without paying a withdrawal penalty and fulfilling a minimum patronization requirement, which would otherwise require Big V to purchase a minimum of 85% of products offered by Wakefern.

This court has jurisdiction under 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a) and (b)(1), and the Order of Reference from the United States District Court for the District of Delaware. Additionally, this is a core proceeding that can be heard and determined by a bankruptcy judge under 28 U.S.C. § 157(b)(2)(B) and (O).

The court holds that Big V's proposed tender of shares in Wakefern and departure from the Wakefern cooperative is part of a series of related transactions leading to the sale of Big V's ShopRite supermarket business or a controlling interest in Big V. Furthermore, the tender of Big V's shares in Wakefern and the abandonment of the ShopRite name constitutes a disposition of Big V's ShopRite supermarket business for value. Lastly, even if the Stockholders' Agreement does not specifically address the transaction proposed by Big V, the intention of the parties was that such a transaction would be a withdrawal from the cooperative and a breach of the implied covenant of good faith and fair dealing. Thus, if Big V implements the proposed tender of shares in Wakefern and patronizes another supplier, Big V will be obligated for the withdrawal payment under the Stockholders' Agreement.[3]

## FINDINGS OF FACT

### 1. Historical Background

#### a. *Wakefern's Founding*

Wakefern, a cooperative of supermarket operators, was formed over fifty years ago to provide its members with the benefits of large-scale purchasing power. Thomas Infusino, a ShopRite supermarket operator and owner in Nutley, New Jersey, described Wakefern's beginnings in 1946 when the Aidekman family, a former employer of Mr. Infusino, started Wakefern. Mr. Infusino opened his own business and became a member of the Wakefern cooper-

---

**2.** All references to the U.S.C. are to the West 2001 edition.

**3.** The withdrawal payment and the minimum patronization requirement are mutually exclu-

sive. Since Big V would incur the withdrawal payment, the court need not address the minimum patronization requirement.

ative shortly after it was formed. Following World War II supermarket chains grew and expanded. Small supermarkets found that their wholesale costs exceeded the retail prices of the large chains. The initial function of the cooperative was to combine the purchasing of the members to obtain lower wholesale costs. Mr. Infusino joined the Wakefern Board of Directors in 1960 and today serves as the Chairman and CEO of Wakefern.

Wakefern services forty-one members who own and operate over 200 ShopRite supermarkets in New York, New Jersey, Pennsylvania, and Delaware. Members use the ShopRite trade name pursuant to a license granted by Wakefern. Through centralized purchasing, Wakefern buys goods at favorable prices and sells them at cost plus a handling charge to members, who then resell these goods to their ShopRite customers at competitive prices. As a cooperative, Wakefern is able to construct warehouse facilities, establish a distribution system and promote the ShopRite name and private label products. Additionally, Wakefern provides a variety of managerial, financial, promotional, and technological services to all of its members.

### b. Wakefern's Growth

The Wakefern cooperative grew over the years as new members were recruited and existing members opened new stores. Staff were hired who developed specialized skills in purchasing the vast variety of products distributed among the member supermarkets such as grocery, meats, seafood, dairy, delicatessen, housewares, etc. Other persons were employed to provide management consulting, financial, merchandising, advertising, human resources, administrative, and other services for the members of Wakefern. For example, Wakefern has a Site Development Committee which assists members in locating sites for new stores, preparing business and merchandising plans, store design, staffing, financing, and inventory stocking. An executive staff oversees all the operations of the Wakefern Cooperative under the control of the Board of Directors and the various committees established by the Board. Today, Wakefern's wholesale volume is $5.5 billion which translates into $7.5 billion in retail sales by the members. For the last five years Wakefern's capital expenditures have been between $29 million and $45 million annually. Besides borrowing to construct warehouses and acquire equipment for handling and distributing goods, Wakefern provides financing for members through loans, guarantees, sale of goods on credit, and assistance with third party financing.

### c. Big V Joins Wakefern

Big V and Wakefern have maintained a business relationship for over forty years. According to Mr. Infusino, in 1959, William Rosenberg, the former President of Big V, applied for membership in Wakefern. At that time Big V operated one store in the Hudson Valley region of New York. After Mr. Rosenberg joined Wakefern, he became a member of the Wakefern Board of Directors. Later Mr. Rosenberg's son also became a member of the board. Big V went public in 1971 and its shares were listed on the American Stock Exchange. Thereafter, the Rosenbergs retired from the supermarket business. The company was taken private in 1987 in a management-led buyout sponsored by CS First Boston. In December 1990, Big V was sold to funds controlled by the Thomas H. Lee Co., a leveraged buyout firm. David Bronstein, CEO of Big V, sat on the board of Wakefern until March 1999, as did Big V officers Joseph Fisher and Mark Schwartz after him. Schwartz stopped attending board meetings in early 2000 and

resigned from Wakefern's board in September 2000 when he left Big V. Today, James A. Toopes is the President and CEO of Big V, a post he has held since September 2000. Previously he was the CFO of Big V, a post he held since April 1996. Big V has not had a representative on Wakefern's board since Mr. Schwartz left in September 2000.

Big V is not only a stockholder of Wakefern, but also the largest member of the cooperative. Over the course of several decades, Big V has become a leading regional supermarket chain operating thirty-nine supermarkets in the Hudson River Valley region, Westchester County, New York, northeastern Pennsylvania, and central and northwestern New Jersey, principally under the trade names "ShopRite" and "Cost Rite". Big V's annual retail sales are $900 million and its wholesale purchases from Wakefern of $700 million amount to 13% of Wakefern's annual volume.

Big V described the benefits of its Wakefern membership in its report on form 10K filed with the SEC for December 1999.

As the largest member of the Wakefern Food Corp., ("Wakefern") the largest cooperative food wholesaler in the United States, the Company benefits from over $5.5 billion in purchasing power, an industry leading private label program, extensive advertising and promotion connected with the ShopRite® trademark and one of the most popular and recognized supermarket names in the region.

Wakefern assists its members in their site selection by providing appropriate site analysis, demographic information, volume projections and projections of the developmental impact on existing member supermarkets in the area.

Advertising and Promotion

High Profile ShopRite® Name: The Company participates in Wakefern's advertising programs that emphasize the well recognized ShopRite® name. The Company benefits from the wide presence across all media Wakefern provides, particularly New York Metropolitan region television and radio.

Big V's advertising strategy emphasizes price, variety, high quality perishables, broad selection of nationally advertised brand name products and an extensive selection of ShopRite® private label merchandise. Most of the Company's advertising is developed and placed by Wakefern and tailored to the Company's specific needs. Big V has several programs designed to inspire customer loyalty including the "Can–Can" and "Half–Price" promotions which instill price and value leadership in customers' minds. "Can–Can" is a three-week promotion having occurred every January for the last 27 years, offering customers the opportunity to buy a wide variety of deeply discounted cases of canned goods. The "Half–Price" promotion is held periodically throughout the year and covers a wide range of categories and items.

Targeted Marketing Programs: The Company has effectively used targeted marketing programs based on the Wakefern supported "Price Plus" frequent shopper card. This three-in-one card has the option to be a co-branded MasterCard™ offering check cashing capabilities, a rebate equal to 1.0% of all ShopRite® purchases and a 0.5% rebate on all other purchases. The benefits offered by the "Price Plus" card inspire customer loyalty that Management believes is a significant component of the Company's success. Approximately 85% of total transactions at the Company's stores are made with the "Price Plus"

card. During 1999, the Company offered internet shopping capability through Wakefern's affiliation with Priceline.com.

The Company's regional focus and the marketing information provided by Wakefern's extensive Price Plus card database give the Company greater flexibility to tailor products offered in each store to the demographics of the communities it serves as compared to national and larger regional chains.

#### d. The Pathmark Defection

Supermarkets General, a member of Wakefern, announced in 1966 that it was leaving the cooperative. At the time, Supermarkets General was the largest member of the cooperative accounting for 49% of its volume. There was no stockholders' agreement in effect at that time. It took two years for Supermarkets General to complete its withdrawal from Wakefern and begin operations independently under the Pathmark name. The loss of Supermarkets General's volume deeply wounded Wakefern. The cooperative barely survived and recognized the risk posed by a large member's departure.

#### e. The Warehouse Agreement

As the cooperative grew, its needs for warehouse facilities expanded. The cooperative had for many years been leasing warehouse space. In 1979, the Board decided to construct Wakefern's own warehouse.[4] This required financing; however, Wakefern, unlike most businesses, does not retain profits. Rather, it distributes all profits back to the members. The minutes of Wakefern's Board of Directors meeting of March 15, 1979, attended by William Rosenberg of Big V, state:

WAREHOUSE GUARANTEE: In order to insure that the new warehouse project can be economically viable, members discussed the need for some form of agreement between Wakefern and each member company whereby Wakefern would offer to supply the member with merchandise at competitive delivered prices and at acceptable levels of service, and the member would agree to purchase from Wakefern at least 85% of his requirements of items available from the Wakefern warehouse for a specific number of years.

In order to entice a lender to finance the new warehouse, the members entered into a Stockholders' Agreement on July 2, 1979 (a.k.a. "Warehouse Agreement") in which they promised to purchase at least 85% of products offered by Wakefern. According to Mr. Infusino, Wakefern could finance the new warehouse if it had "an instrument that guaranteed the fact that our volume would not be diminished so that we would have the resources to pay the money back to the lenders." The 1979 Stockholders' Agreement reflected this intention:

1. *Commitment to Purchase Food Requirements.*

(a) Each Stockholder, for a period of ten years commencing on the date that the New Warehouse is first placed in service and ending on the tenth anniversary thereof, shall purchase from Wakefern, at least 85% of such Stockholder's requirements, during each fiscal year of Wakefern ...

The loan for the Wallkill warehouse has since been paid off, but additional loans have been taken by Wakefern and the Stockholders' Agreement has been amend-

---

**4.** Incidentally, the new warehouse was to be built in Wallkill, New York, which is in Big V's market region.

ed and restated on several times. The terms Warehouse Agreement and Stockholders' Agreement are used interchangeably.

## 2. Governing Documents

The respective rights and obligations of Big V and Wakefern are governed by the Wakefern By-Laws adopted on April 16, 1981 and most recently amended on September 26, 1994. In addition there is the Stockholders' Agreement—also referred to as the Warehouse Agreement—the most recent version of which is dated February 29, 1992.

The relevant provisions of both the Stockholders' Agreement and the By-Laws are as follows:

### a. *Wakefern Corp. By-Laws*
### *Preamble*

Wakefern Food Corp. shall be operated upon the cooperative plan to foster the development of entrepreneurism among independent retail merchants dealing in consumer products for home use for their mutual economic and merchandising assistance and to foster and promote the "Shop Rite" trade name and trademark, goodwill and image.

Wakefern will provide a medium for obtaining the advantages of united efforts of its members in carrying on the production, assembly, distribution and marketing of food stuffs ...

To accomplish its goals and purposes, Wakefern shall be dedicated primarily to supporting its members' supermarket businesses as the same have been traditionally operated under the "Shop Rite" trademark and trade name and developing, furthering and promoting the good will and image of the "Shop Rite" name for the mutual benefit of its members and the consuming public.

### Article IX, § 5, "Right of Stockholder to Sell Stock and Indebtedness to Wakefern"

(a) Each stockholder shall have the right at any time to require Wakefern to purchase all, but not less than all, of such stockholder's capital stock and indebtedness of Wakefern out of funds legally available therefor.

(b) Wakefern shall consummate the purchase of the selling stockholder's stock and indebtedness at a time and date to be determined in the sole discretion of Wakefern, but in no even [sic] sooner than thirty (30) days or later than ninety (90) days after

Wakefern's receipt of the selling stockholder's notice of sale.

### Article IX, § Section 8. *Cessation of Dealing with Wakefern.*

Effective upon the closing of the purchase by Wakefern of all the shares of stock of a stockholder, its relationship with Wakefern shall be terminated. Thereupon, Wakefern shall cease to be obligated to sell merchandise to said selling stockholder or to provide any other services which are rendered or provided by Wakefern to its stockholders generally. Anything herein or in Article XII of these By-Laws to the contrary notwithstanding, the Board of Directors in its sole discretion and upon the request of a selling stockholder, may but shall not be obligated to permit such selling stockholder to continue to receive merchandise and/or services from Wakefern for such period and upon such terms and conditions as the Board shall determine.

### b. *Stockholders' Agreement*

AGREEMENT, dated as of August 20, 1987, as amended on February 29, 1992,

by and among WAKEFERN FOOD CORP., a New Jersey corporation with principal offices located at 600 York Street, Elizabeth, New Jersey 07207 ("Wakefern"), and each of the member stockholders of Wakefern listed on Schedule 1 hereto (hereinafter individually called a "Stockholder" and collectively the "Stockholders").

## WITNESSETH:

*Premises:*

A. Wakefern is a corporation operated on the cooperative plan and the Stockholders are retail merchants, primarily dealing in consumer products for home use and deriving mutual economic and merchandise assistance from Wakefern; and . . .

C. Wakefern's viability is based primarily on the volume generated by aggregating the purchasing power of all of the Stockholders; and

D. The Board of Directors of Wakefern and the Stockholders believe it is in Wakefern's and each of the Stockholder's best interest that the Stockholders continue to purchase their supplies and inventory from Wakefern; and . . .

F. To induce one or more lending institutions to provide the necessary financing for such capital expenditure program, the Stockholders have agreed, subject to the terms and conditions contained herein, to make certain financial commitments to Wakefern;

NOW, THEREFORE, for and in consideration of the premises and the mutual promises and covenants hereinafter contained, Wakefern and the Stockholders hereby agree as follows:

## Section 1, "Commitment to Participate":

1.1 *Minimum Patronization Requirement.* Each Stockholder, during the term of this Agreement (the "Term"), shall purchase from Wakefern, during each quarter of each fiscal year of Wakefern, at least 85% of such Stockholder's purchases for each of such Stockholder's stores in each of Wakefern's product categories listed on Schedule 2(A) hereto . . . .

## Section 2, "Failure to Observe Minimum Patronization Requirement; Withdrawals; Sale of a Store; Sale of Stockholder to Wakefern; Right of First Refusal":

2.1 *Failure to Observe Minimum Patronization Requirement.* If a Stockholder fails to meet or refuses to comply with the minimum patronization requirement set forth in Section 1.1 hereof, such defaulting Stockholder shall be required to pay to Wakefern in cash within 10 days after demand therefore, an amount calculated pursuant to the provisions of Schedule 3 hereto;

2.2 *Notice of Withdrawals; Withdrawal Payment.* Each Stockholder agrees to give Wakefern at least thirty (30) days' prior written notice of the happening of any of the following events (each a "Withdrawal"):

(i) a sale or other disposition for value of all or substantially all ShopRite supermarket business of such Stockholder in a single transaction or series of related transactions; or

(ii) the merger or consolidation of such Stockholder with or into another entity (irrespective of whether such Stockholder is the surviving or disappearing entity); or

(iii) the transfer of, or any transaction or series of transactions that have the effect of transferring a "controlling interest" in such Stockholder . . .

Lastly, Big V's obligation to purchase from Wakefern involves an evergreen provision. This provision was added in the 1992 amendment to the Stockholders' Agreement and states:

3.8 *Term of Agreement.* "This Agreement, and the rights and obligations of the parties hereto contained herein, shall remain in full force and effect until the Termination Date . . . For purposes hereof the "Termination Date" shall mean the date which is the tenth anniversary of the date . . . on which the Company receives written notice signed by the Requisite Stockholder . . . requesting that this Agreement be terminated pursuant to this Section 3.8. For purposes hereof, the term "Requisite Stockholder" shall mean a Stockholder or group of Stockholders whose supermarket operations, in the aggregate, accounted for at least 75% of Wakefern's total sales of the Products during the most recent fiscal year of Wakefern ended prior to the Determination Date to Stockholders who are parties to this Agreement of the Determination Date."

Big V was familiar with the evergreen provision as evidenced by its Report on form 10–K filed with the SEC on April 12, 2000, which states,

The Wakefern Warehouse Agreement contains an evergreen provision providing for a continual 10–year renewal period. The Company's obligation may be terminated only 10 years following the approval of such termination by the holders of at least 75% of the outstanding voting stock of Wakefern. . . .

Big V valued its membership in Wakefern at $40 million on its balance sheet. In its form 10K, Big V explained the value of this asset.

*Wakefern Warehouse Agreement*— Represents the value assigned to the Company's ability to participate in Wakefern as a member and its ability to share in the annual patronage dividend. The value assigned resulted from fair market determinations made by independent appraisers.

If a member decides to sell any of its stores or to withdraw from the cooperative, the Stockholders' Agreement encourages the member to sell to a "qualified successor," i.e., to Wakefern itself, to another Wakefern member, or to any other entity that is willing and able to become a Wakefern member. If the member sells to a qualified successor the purchase volume remains within Wakefern.

2.4. *Qualified Successor.* Notwithstanding the foregoing provisions of this Section 2, if the purchaser, acquiror [sic] or successor in any Withdrawal or Sale of a Store is a "qualified successor" (as hereinafter defined), such Stockholder, upon completion of the Withdrawal or Sale of a Store described in said notice, shall be relieved of all obligations under this Agreement with respect to such Withdrawal or Sale of a Store arising at the time of or immediately after the date of completion of such Withdrawal or Sale of a Store. For purposes of this Section 2.4, the term "qualified successor" shall mean Wakefern, a direct or indirect wholly owned subsidiary of Wakefern or any person, firm or corporation that agrees in writing to be bound by all the provisions of this Agreement and the By–Laws of Wakefern. . . .

### 3. Wakefern's Debt Obligations

Wakefern's growth and establishment of a warehouse and distribution system has been financed, in part, by debt. Wakefern owes approximately $285 million. Wakefern engaged in several major borrowings: 1992 ($60 million), 1994 ($55 million) and 1999 ($100 million). Recently, Wakefern borrowed $40 million to construct another

warehouse in Woodbridge, New Jersey. In the course of negotiating the loan agreements Wakefern made detailed presentations to the lenders regarding its unique structure such as the commitment by members to purchase 85% of their goods from Wakefern and the ten-year evergreen clause. Although Wakefern does not retain earnings it has a ten-year commitment from its customers providing a reliable source of funds for debt repayment. Without the Stockholders' Agreement, Wakefern would be unable to borrow large amounts of money. Morever, Wakefern qualifies for a lower interest rate because of the Stockholders' Agreement. All of Wakefern's loans are for terms of ten-years or less as a consequence of the evergreen clause in the Stockholders' Agreement. Wakefern's loan agreements have typical financial covenants such as a requirement to maintain a minimum tangible net worth, debt service ability, and a fixed charge coverage ratio.

**4. Lee Funds' Side Letter Agreements**

As mentioned earlier, funds managed by the Thomas H. Lee Company (the "Lee Funds") acquired equity control of Big V in December 1990. Historically, all owners of ShopRite supermarkets have personally guaranteed their company's debt to Wakefern for goods purchased on credit. The Lee Funds balked at guaranteeing any of Big V's debt, so Wakefern agreed to an alternate arrangement in a side letter. The side letter agreements required Big V, or if Big V did not do so, the Thomas H. Lee Company, to post a letter of credit in favor of Wakefern for Big V's purchases, roughly $35 million. This letter of credit would be triggered in the event that Big V failed to meet the "net worth" test described in the side letter agreements. Big V described these side letter agreements in its 10K.

*Letter of Credit Obligation to Wakefern*—In connection with the acquisition of the Predecessor Company, the Predecessor Company and Holding (collectively, the "Big V Companies") and certain members of the Company's management entered into a letter agreement with Wakefern (the "Wakefern Letter") as a condition to Wakefern's agreement not to deem the Big V Companies to be an "Unqualified Successor" as defined in Wakefern's By–Laws as a result of the consummation of the acquisition. In accordance with the terms of the Wakefern Letter, the Big V Companies have agreed that it at any time certain net worth tests are not met (a "Net Worth Event"), then the Big V Companies are required to obtain an irrevocable letter of credit in favor of Wakefern in an amount equal to two and one-half times the average weekly purchases of the Company from Wakefern for the most recent calendar quarter of Wakefern ended prior to such event. In addition, under the Wakefern Letter the Big V Companies are required to obtain a letter of credit in favor of Wakefern in the event the Company fails to pay any of its payables to Wakefern within the time periods and in the manner prescribed by the Wakefern By–Laws.

**5. Consolidated Law Suit**

In 1993, Consolidated Supermarkets, Inc., a member of the Wakefern cooperative, sought to sell its four ShopRite stores to Pathmark, a competitor of Wakefern. Wakefern sued in New Jersey state court and sought a preliminary injunction to prevent Consolidated from avoiding the withdrawal payment under the Stockholders' Agreement. On November 18, 1993, a certification of the Directors of Wakefern ("Consolidated Certification") was filed in the Superior Court of New Jersey. Big V supported Wakefern's request for relief

and its Chairman, David Bronstein, signed the Consolidated Certification in support thereof. Wakefern's motion for preliminary injunction was granted.[5]

With respect to the minimum patronization requirement the Consolidated Certification signed by David Bronstein states, "[t]his is the cornerstone for the entire structure. This requirement prevents members from switching suppliers in response to changing market conditions, and thereby from leaving the cooperative in the lurch." In addition, the certification states:

> Just as important, if any member can effectively walk out of the cooperative at any time without payment, then it will be difficult if not impossible for Wakefern to obtain additional financing. No bank or institution will give Wakefern tens of millions of dollars of unsecured financing on favorable terms without the assurance that the co-op will continue to operate in the future with the necessary volume to pay off loans.

## 6. Lee's Liquidation Efforts

### a. 1996–1998

The Lee Funds' plan, generally, was to create value in Big V then liquidate their investment in about five years. During a period between 1996–98, the Lee Funds attempted to market Big V to various financial investors such as Saunders, Carpenter, McGrew, and to strategic buyers, i.e., competitors such as Royal Ahold, a Dutch conglomerate that operates Stop and Shop supermarkets in the United States. Big V nearly reached an agreement with Royal Ahold, but because of the withdrawal payment provision, the sale process was terminated. Wakefern determined that Big V would be liable for a withdrawal payment in the amount of approximately $200 million. Ahold was unwilling to pay that amount.

### b. Big V's Management Shake-up

After the unsuccessful sale attempts, in February 1999 Big V hired a new CEO, Mark Schwartz. Mr. Schwartz was a veteran of Walmart's expansion and claimed credit for the Walmart Supercenter concept. After leaving Walmart, Mr. Schwartz did a short stint with Hechinger's, another retailer which ended up being liquidated in bankruptcy. Mr. Schwartz installed several of his Hechinger's cohorts in key management positions at Big V. The

---

5. In the case at bar, the issue of collateral estoppel was raised by Wakefern in its motion for summary judgment. Wakefern argued that the doctrine of collateral estoppel prevented Big V from later taking the position that it could leave Wakefern without paying the withdrawal penalty. After reviewing the state court decision, this court ruled that collateral estoppel did not apply as to the issues raised in the Consolidated case. Following *Mattson v. Hawkins*, 231 B.R. 222 (D.N.J. 1999), this court applied the New Jersey state law of collateral estoppel, which requires that a party show the following: (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the earlier proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was party to, or in privity with, the party to earlier proceeding. *See id.* at 231.

While addressing each of these elements, this court focused largely on the third element and found that the state court's determination was not a final judgment since throughout the state court's decision, Judge Boyle repeatedly advised that he had not reached the merits of the case. Instead, he relied only on the affidavits of the parties and determined that there was a real possibility that a determination of the facts might change at trial. In effect, the state court was attempting to preserve the status quo—thus, its decision was not a final judgment on the merits.

new management team embarked on an ambitious growth plan to acquire stores, open new stores and upgrade existing stores.

### c. Big V's Cash Shortage

In October 1999, management of Big V forecasted that cash would be tight in the second quarter of 2000 and that available borrowing under Big V's revolving credit facility would be exceeded from mid-August through the end of the year 2000. Big V's cash shortage was caused by its expanding and spending too much on capital expenditures. Without a cash infusion, Big V would be unable to pay its debts as they became due. There were efforts throughout the year 2000 to secure either a minority equity infusion, a refinancing, an initial public offering, or a major equity infusion by John Childs, a Big V board member.

In addition, Thomas H. Lee Company became concerned that its side letter agreement with Wakefern would be triggered. That would require posting a letter of credit for two and a half times Big V's average weekly purchases from Wakefern—approximately $35 million. To obtain the letter of credit, the Lee Company would, in effect, have to invest another $35 million in Big V. This was contrary to Lee's desire to bail out its investment in Big V.

### d. 2000 Sale Efforts—Peter J. Solomon Co.

In January 2000, the Lee Funds again decided to try to liquidate their ownership in Big V. The investment banking firm of Peter J. Solomon Company ("PJS") was hired to market Big V to potential buyers. Mr. Hornstein, a managing director of PJS, testified at his deposition that his company was hired to find outside funds or to sell Big V. The time for accomplishing this goal was mid to late 2000 so that Thomas H. Lee Co. could avoid putting more money into Big V under the side letter agreement with Wakefern. PJS continued to seek a buyer for Big V for months after April 2000 when Big V purportedly ceased sale efforts. Big V did not terminate PJS's engagement until late August 2000.

### e. Tender/Independent Scenario

Frustrated in the efforts to sell Big V by the prospect of a large withdrawal payment, Mr. Schwartz determined to find a way of avoiding it. He and Mr. Toopes agreed to take the Stockholders' Agreement and Wakefern By–Laws home over a weekend to see if a loophole could be found. By Monday when he returned to work, Mr. Schwartz thought he had found a solution. First, the By–Laws allow any stockholder to tender its shares to Wakefern and require Wakefern to redeem them for a stated value. Upon sale of shares back to Wakefern, the member would no longer be a "Stockholder," Schwartz theorized, thus it would not be bound by the Stockholders' Agreement.

Mark Schwartz fashioned a plan whereby Big V could leave the cooperative without having to pay any withdrawal payment. Generally, the idea was: (1) tender Big V's Wakefern stock back to Wakefern under Article IX of the By–Laws; (2) transition to a new supplier thereby hoping to terminate Big V's relationship with Wakefern without incurring a withdrawal penalty; and (3) after a period of time, consummate a sale of Big V. For convenience the court will refer to this as the Tender/Independent Scenario. To accomplish this Big V needed an alternate supplier.

### f. C & S Supply Agreement

In early 2000, Mark Schwartz investigated the possibility of an alternate supply

agreement with three wholesale suppliers: SuperValu, Fleming, and C & S Wholesale Grocers, Inc. ("C & S"). The inquiries with SuperValu and Fleming were perfunctory. Mr. Schwartz had a brief meeting with the President of Fleming at Teterboro airport. He requested a proposal from Fleming that was never received. No follow up request was made to Fleming. Mr. Schwartz also had one meeting with a representative of SuperValu to explore a possible supply contract. After a follow up conference call with other SuperValu people, Mr. Schwartz was supposed to get back to them, but never did. No one at Big V, other than Mr. Schwartz, communicated with SuperValu or Fleming. No information was exchanged nor proposals received. Mr. Schwartz eliminated these potential alternative suppliers right off the bat.

C & S is one of the largest food wholesalers in the United States with operations in Connecticut, Maryland, Massachusetts, New York, Pennsylvania & Vermont. In October 1999, Mr. Schwartz invited Rick Cohen, the President of C & S, to visit Big V. Following that initial meeting there was no further contact until Spring 2000. Big V hoped to have an alternate supplier in place and leave Wakefern by August 1, 2000 before the side letter would be triggered. Rick Cohen came to Big V's headquarters again in late April or early May 2000. Mr. Schwartz informed him that Big V wanted to switch to C & S. Mr. Cohen estimated that C & S's prices would be comparable to Wakefern. A draft agreement was received from C & S on May 4, 2000 and revised drafts were issued throughout May and June. The process took longer than Big V hoped because of difficulty in securing consent of Big V's

lenders to a second lien on inventory. When C & S balked at financing Big V without collateral, Big V was able to interest one of its directors, John Childs, in investing $35 million of equity into Big V. A Memorandum of Understanding among Big V, Childs, C & S and Thomas H. Lee Co. was signed on June 26, 2000. Finally, a supply contract with C & S was signed on August 3, 2000.[6]

### g. April 17, 2000 Board Meeting

At Big V's board meeting held April 17, 2000 Mr. Schwartz presented his plan—the Tender/Independent Scenario. The documents included in the board package assembled in preparation for the meeting and the minutes of the meeting are quite revealing as to the plan and intent of Big V's management and owners.

The Board approved transitioning from Wakefern to another supplier—C & S Wholesale Grocers, Inc. No proposals from other alternate suppliers were considered. An analysis of the economic benefits of leaving Wakefern was presented which was based on the erroneous assumption that C & S's prices would be comparable to Wakefern's and failed to consider several additional expenses imposed by C & S. Approval for a switch to C & S was granted before Big V had even received C & S's itemized price list or a draft agreement.

A resolution was adopted as follows:

RESOLUTION FOR

APRIL 17, 2000 BOARD MEETING OF

BIG V SUPERMARKETS, INC.

The Board reviewed recent developments with Wakefern, including Wake-

---

**6.** The Supply Agreement indicated a commencement date of February 3, 2001; however, because of Big V's bankruptcy filing, the C & S contract with Big V was amended in March 2001 and on June 1, 2001 terminated by C & S. Childs declined to make any investment in Big V after Mark Schwartz left in September 2000.

fern's continuing refusal to permit Big V to pursue its business plan or take the actions which management believes are critical to Big V's future. Management updated the options available to Big V, including the recent unsuccessful efforts to locate a prospective strategic or financial acquiror, departing from Wakefern without being acquired, and the unlikely possibility of remaining profitable as a continuing member of Wakefern.

Management discussed its recent negotiations with C & S Wholesale concerning a possible supply contract if Big V were to leave Wakefern, and discussed the economic ramifications of such a scenario versus remaining as a member of Wakefern. Management also discussed its reviews that an acquisition of the company by a third party was not a realistic alternative.

Following further discussion, the Board unanimously resolved as follows:

THE UNDERSIGNED, being all of the members of the Board of Directors (the "Board") of Big V Supermarkets, Inc. ("Big V"), hereby adopt the following resolutions:

WHEREAS, Big V has been considering various strategic alternatives, including transactions whereby Big V would be sold in its entirety to a financial or strategic purchaser, and

WHEREAS, at Big V's Board meeting on April 17, 2000, the Board considered pursuing a transaction with Millennium, which would have involved a purchase of the Corporation for $310 million; and

WHEREAS, the Board has determined that it is no longer in the best interest of Big V to pursue a sale of the Company; and

WHEREAS, the Board is no longer considering such a sale; and

WHEREAS, Big V has determined that it should consider a supply agreement with C & S Wholesale, and leave Wakefern.

NOW, THEREFORE BE IT

RESOLVED, that the Board is no longer considering or pursuing a sale of Big V; and further

RESOLVED, that Big V will pursue a supply agreement with C & S Wholesale and leaving Wakefern; and further ...

Apparently, Schwartz had vetted the Tender/Independent Scenario with Big V's outside counsel. The court deduces that counsel cautioned against implementing the Tender/Independent Scenario while simultaneously pursuing sale of Big V. This could be seen as a "withdrawal" as defined in the Stockholders' Agreement. Therefore, counsel recommended a cessation of all sale efforts and memorializing that decision in a resolution.[7] It was thought that a hiatus of twelve to eighteen months should be sufficient to avoid the "series of transactions" clause of the Stockholders' Agreement. The fact that Big V had premeditated this hiatus is evidenced by a memorandum dated June 6, 2000 from William Hamlin of C & S summarizing a conference call with Mr. Toopes, "Tom Lee is not cashed out until the second transaction occurs in about 18 months."

### h. Sale Efforts Continue

Despite adopting the resolution on April 17, 2000 to cease all sale efforts, Big V continued seeking a buyer. All of the following occurred after the April board meeting.

---

7. Note that this type of decision is not usually memorialized in a formal resolution. It is apparent that the resolution was prepared by counsel to establish a paper trail to show that Big V abandoned efforts at sale and embarked solely on the Tender/Independent track.

### (i) Millennium Partners/Stockbridge

Millennium Partners, also referred to as Stockbridge Partners, is a financial firm from Dallas, Texas. They expressed an interest in acquiring the stock of Big V and actually made a written offer. Management of Big V were skeptical of Millennium's ability to finance their offer. Nevertheless, at the April 17, 2000 meeting, Big V's board instructed management to pursue Millennium and see if financing could be secured. Discussions continued for six to eight weeks until Big V's management concluded that it was no longer worth pursuing Millennium. This conclusion was reached several weeks after the April 17, 2000 resolution by the board to cease sale efforts.

### (ii) Wakefern

In May or June 2000, Mark Schwartz met with executives of Wakefern on several occasions and inquired if Wakefern was interested in purchasing Big V. Wakefern did express interest but felt the Lee Funds' price was too high.

### (iii) Schwartz/Toopes Management Buyout

On June 29, 2000, Messrs. Schwartz and Toopes met with Wakefern's executives and disclosed that they considered buying Big V themselves and remaining a member of Wakefern. They even asked if Wakefern would assist in locating financing for a leveraged buyout. Nothing came of this idea.

### (iv) Pathmark/Royal Ahold/Safeway

PJS had recommended approaching strategic buyers i.e., competitors such as Pathmark and Royal Ahold (Stop and Shop). Big V's board initially declined authorization to approach another super-market operator as a potential buyer because the withdrawal payment would be triggered. As the expected default under the side letter loomed closer, Big V authorized PJS to approach Ahold and Pathmark about an acquisition in mid-June to July 2000. Ahold expressed interest but was concerned about antitrust implications since the Federal Trade Commission disfavored Ahold's acquisition of another chain. During negotiations with C & S regarding the Supply Agreement, Big V's management mentioned the possibility that Big V might be acquired by another supermarket chain supplied by C & S—Ahold's subsidiary, Stop and Shop would fit that description. Although the C & S Supply Agreement had a large withdrawal payment, sale of Big V to another C & S customer would be exempt from withdrawal liability.

Mark Schwartz knew the President of Pathmark and arranged an initial contact. Pathmark was interested as well, but had recently emerged from its own bankruptcy proceeding. Perhaps in the near future Pathmark could entertain a merger with Big V. Pathmark is, also, a C & S customer and would fit the description of an acquirer of Big V exempt from the withdrawal payment under the C & S Supply Agreement.

In addition, Mr. Toopes felt that, "we would be able to combine Pathmark or Big V with Safeway by May or June 2001." Safeway is also a C & S customer.

### (v) Ceruzzi

During ongoing negotiations with C & S, Big V also negotiated with Lou Ceruzzi regarding a possible sale of Big V. A business plan presented to Big V's lenders in May 2000 included information regarding a developer and the landlord of Big V's Wilkes–Barre store, Lou Ceruzzi. Mr. Ceruzzi was also going to be the developer for the four stores that Big V had original-

ly contemplated opening in Pennsylvania. In mid-September 2000, Big V sold Mr. Ceruzzi three Big V stores located in Hyde Park, Beekman, and Poughkeepsie, New York for approximately $5.9 million. At the time, Mr. Ceruzzi was the landlord to a Grand Union site that sits between the former Big V Hyde Park store and the former Big V Poughkeepsie store. Big V sold its Hyde Park store, a store that was among Big V's top third in profitability, and Mr. Ceruzzi undertook to make available to Big V a former Grand Union site that had been constructed but never opened.[8]

Mr. Hornstein of Peter J. Solomon Co. testified that his first contact with Lou Ceruzzi was in mid-June 2000. They spoke about Ceruzzi investing in and acquiring Big V. Mark Schwartz also confirmed that Mr. Ceruzzi was interested in purchasing Big V and selling off its assets to either Pathmark or Ahold. Ceruzzi had potential equity partners, Roth and Starwood, and expressed interest in acquiring Big V as an investment. Management of Big V and its investment banker continued discussions with Ceruzzi long after April 2000—all the way through completion of the C & S Supply Contract on August 3, 2000. Mr. Hornstein of PJS and Mark Schwartz went to Connecticut in June 2000 to meet with Ceruzzi's equity partner, Starwood. Ceruzzi was given drafts of the C & S contract and asked to comment on it, which he did. An exception was carved out of the C & S Supply contract so that if Big V were sold to a C & S customer, no withdrawal payment would be due to C & S. That is consistent with a plan to sell Big V to Ceruzzi (after a 12–18 month waiting period) so that Ceruzzi could put Stop & Shop or another C & S customer in place as operator.

All of these efforts to sell Big V occurred after April 17, 2000 when the resolution supposedly ceasing sale efforts was adopted.

### 7. Bank Group Refuses Consent

Big V had outstanding loans of approximately $100 million to a bank group led by Fleet Bank. The loan documents required the lenders' consent for major changes in Big V's business including a change of suppliers. In the Spring of 2000, Big V approached the bank group and requested consent to switch from Wakefern to C & S Wholesale Grocers. The bank group declined. C & S had requested a second lien on Big V's inventory to secure financing to be provided under the Supply Agreement. The bank group refused consent to a second lien on its collateral. Despite lack of consent from the bank group, Big V continued with plans to transition from Wakefern to C & S.

### 8. Big V Files Bankruptcy

Big V retained bankruptcy counsel in August 2000 and planned to file a chapter 11 proceeding to restructure its debt. The company also planned to file a declaratory judgment action seeking a determination that no liability would accrue to Wakefern under the Tender/Independent Scenario.

In the end, management's forecast that Big V would run out of cash proved to be true. Big V's bank group asserted an event of default under the loan agreement and seized all cash in Big V's accounts. Big V could not make its regular weekly payments for goods due to Wakefern on Tuesday, November 21, so on the next day,

---

**8.** Ultimately, however, Big V did not take possession of the former Grand Union site and, as a result, Mr. Ceruzzi paid Big V $1 million and later either sold or leased the site to Wakefern's competitor, Stop & Shop.

November 22, 2000, Big V filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the same date, the Debtor commenced this adversary proceeding.

### 9. Big V's Departure and its Potential Effect on Wakefern

If Big V were to stop purchasing from Wakefern, the loss of 13% of its volume would mean that all of Wakefern's fixed cost would be borne by the remaining members. Fixed costs include the expenses of the warehouses and distribution network, interest on debt, and headquarters overhead. The extra pro rata costs would be spread among the remaining members of the cooperative through increased upcharge for goods sold or an assessment per store.

In late 1999, and again in the Spring of 2000, Wakefern's Board authorized a capital expenditure of $65 million, mostly with borrowed funds, to construct a new perishables warehouse in Woodbridge, New Jersey. If Big V's business, accounting for 13% of Wakefern's sales, is taken elsewhere, Wakefern would not need the new warehouse. Had Wakefern's Board known that Big V was leaving, it would not have authorized the expenditure and borrowing for the Woodbridge warehouse.

Wakefern's loan agreements all have financial covenants requiring minimum tangible net worth, debt service capability and fixed charge coverage ratio. If Big V were to leave, Wakefern would be perilously close to violating its loan covenants. If that were to happen, the lenders could accelerate $285 million of debt which Wakefern could not pay. That would force Wakefern into reorganization or liquidation. As to the prospects for renegotiating with Wakefern's lenders, in the words of Kenneth Jasinkiewicz, Wakefern's CFO, "If we have a Stockholders' Agreement that doesn't hold water, I don't know what I've got to negotiate with."

### DISCUSSION

■ This adversary proceeding was commenced under the Declaratory Judgment Act, 28 U.S.C. § 2201, which provides:

> In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

The burden of proof is on the plaintiff seeking declaratory judgment. *Chicago Pneumatic Tool Co. v. Ziegler*, 151 F.2d 784, 799 (3d Cir.1945).

Big V seeks a declaration that it may tender its shares in Wakefern Food Corporation under Article IX, Section 5 of the By-Laws and leave the cooperative without further obligation for either the withdrawal payment or the mandatory participation requirements of the Stockholders' Agreement. According to Big V, it intends to operate as an independent entity and obtain its wholesale goods from another supplier. Although ultimately it will look to sell or merge with another chain, Big V maintains it has no present agreement to do so. The court refers to this scheme as the Tender/Independent Scenario.

Big V acknowledges that it would owe a withdrawal payment under the Stockholders' Agreement were it to sell to or merge with an "unqualified successor." Big V maintains, however, that the Stockholders' Agreement does not specifically address

the Tender/Independent Scenario; therefore, no withdrawal payment will be due. Wakefern argues that the Tender/Independent Scenario is encompassed within the "sale or other disposition for value of the Shop Rite supermarket business" language of Section 2.2 of the Stockholders' Agreement. Wakefern further contends that Big V's leaving Wakefern is merely one step in a plan to sell Big V to, or merge with, an unqualified successor. In either case, says Wakefern, the withdrawal payment will be due.

## 1. Principles of Contract Interpretation and Construction

In the interpretation, and ultimately, in the construction of contracts as well, the avowed purpose and primary function of the court is to ascertain the intention of the parties. The fundamental and cardinal rule is that the intention of the parties is to be ascertained as of the time they executed the contract, and effect is to be given to that intention if it can be done consistently with legal principles ...

Whatever may be the inaccuracy of expression or the inaptness of the words used in an instrument from a legal perspective, if the intention of the parties can be clearly discovered, the court will give effect to it and construe the words accordingly.

11 RICHARD A. LORD, WILLISTON ON CONTRACTS, § 30.2, at 25 (4th ed.1999)(internal citations omitted). The parties agree that New Jersey substantive law governs this adversary proceeding.

■ Under the law of New Jersey, the central query in the construction of contracts is the intent of the parties. It is not necessarily the parties' true intent, but the intent as expressed or apparent in the writing, that controls. Where the contract is clear and unam-

biguous, the determination of the parties intent is purely a question of law within the exclusive province of the trial court. *J.I. Hass Co. v. Gilbane Bldg. Co.*, 881 F.2d 89, 92 (3d Cir.1989), *cert. denied*, 493 U.S. 1080, 110 S.Ct. 1135, 107 L.Ed.2d 1040 (1990).

■ The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them. To this end, the language used must be interpreted "in accord with justice and common sense."

■ In the quest for the common intention of the parties to a contract the court must consider the relations of the parties, the attendant circumstances, and the objects they were trying to attain. An agreement must be construed in the context of the circumstances under which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose.

■ However, "[w]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction" and the courts must enforce those terms as written. The court has no right "to rewrite the contract merely because one might conclude that it might well have been functionally desirable to draft it differently." Nor may the courts remake a contract better than the parties themselves have seen fit to enter into, or to alter it for the benefit of one party to the detriment of the other. *Sons of Thunder, Inc. v. Borden, Inc.*, 285 N.J.Super. 27, 47, 666 A.2d 549, 559 (App. Div.1995), *rev'd on other grounds*, 148 N.J. 396, 690 A.2d 575 (1997).

## 2. Step Transaction

■ The Stockholders' Agreement provides that a sale or transfer of a controlling interest in "a series of related

transactions" will constitute a withdrawal. Wakefern maintains that the Tender/Independent Scenario is merely part of a series of transactions leading to a sale or transfer of a controlling interest in Big V. The step transaction doctrine is a judicially-created doctrine that has traditionally been applied in the tax context. *Redding v. Commissioner*, 630 F.2d 1169, 1175 (7th Cir.1980), *cert. denied*, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 338 (1981). Nevertheless, courts often apply the step transaction concept in other fields as well, including disputes involving issues of corporate governance, contract interpretation, and fraudulent conveyances. *See Voest–Alpine Trading USA, Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 211–213 (3d Cir.1990) (describing how a variety of simultaneous separate transactions functioned as a subterfuge and could be telescoped into a single fraudulent transaction whose purpose it was to violate the Uniform Fraudulent Conveyance Act); *see also United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1303 (3d Cir.1986) (various loans and repayment schemes constituted one integrated transaction for purposes of addressing whether the loan was a fraudulent conveyance); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 290 (Bankr.S.D.N.Y.1990) (court relied on the step transaction doctrine to determine whether two transactions ought to be collapsed into one for purposes of New York's fraudulent conveyance laws).

"Under this doctrine, interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction." *Commissioner v. Clark*, 489 U.S. 726, 738, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989). Therefore, by "linking together all interdependent steps with legal or business significance, rather than taking them in isolation," the result may be based "on a realistic view of the entire transaction."

*Id.* (citing 1 B. BITTKER, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS, ¶ 4.3.5, at 4–52 (1981)).

■ Since the inception of the step transaction doctrine, "[c]ourts have developed three tests for determining when the step transaction doctrine should operate to collapse the individual steps of a complex transaction into a single integrated transaction for tax purposes; (1) end result, (2) interdependence, and (3) binding commitment." *True v. United States*, 190 F.3d 1165, 1174–1175 (10th Cir.1999) (citing *Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1522 (10th Cir. 1991)); *accord Noddings Inv. Group, Inc. v. Capstar Communications, Inc.*, No. 16538, 1999 WL 182568, at *6 (Del.Ch.), *aff'd*, 741 A.2d 16 (Del.Supr.1999).

■ The end result test combines "into a single transaction separate events which appear to be component parts of something undertaken to reach a particular result." *Id.* at 1175 (citing *Kornfeld v. Commissioner*, 137 F.3d 1231, 1235 (10th Cir. 1998), *cert. denied*, 525 U.S. 872, 119 S.Ct. 171, 142 L.Ed.2d 139 (1998); *Associated Wholesale Grocers v. United States*, 927 F.2d 1517, 1523 (10th Cir.1991)). If a series of closely related steps in a transaction are merely the means to reach a particular result, the court will not separate those steps, but instead treat them as a single transaction. *Kanawha Gas & Utils. Co. v. Commissioner*, 214 F.2d 685, 691 (5th Cir. 1954).

■ Under the interdependence test, the court disregards the effects of individual transactional steps if "it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts." *Kuper v. Commissioner*, 533 F.2d 152, 156 (5th Cir.1976). Thus, the interdependence test relies to a lesser degree on subjective intent than the end

result test. It focuses not on a particular result, but on the relationship between the individual steps and "whether under a reasonably objective view the steps were so interdependent that the legal relations created by one of the transactions seem fruitless without completion of the series." *Kornfeld v. Commissioner*, 137 F.3d 1231, 1235 (10th Cir.1998).

Finally, the most restrictive alternative is the binding commitment test. *Noddings Inv. Group*, 1999 WL 182568, at *6. Here a series of transactions may be integrated if, at the time the first step is entered into, there is a binding legal commitment to undertake the later step or steps. A court must make an objective determination as to whether the parties were bound to effect later steps when the first step was taken. *See Commissioner v. Gordon*, 391 U.S. 83, 96, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968) (binding commitment test not satisfied where there was no binding commitment at the time of the first distribution of common stock which occurred approximately two years before the second distribution); *see also* 11 JACOB MERTENS, JR., THE LAW OF FEDERAL INCOME TAXATION, § 43.253 (1997) (cited in *Noddings Inv. Group*, 1999 WL 182568, at *6). "The binding commitment test is seldom utilized, and only applies to situations 'where the taxpayer is subject to an obligation or binding commitment, at the time the first step is entered into, to pursue the successive steps in a series of transactions,' usually spanning several years." *True v. United States*, 190 F.3d at 1175 n. 8.

In applying these tests, the court must look first to the relevant language of the Stockholders' Agreement. Section 2.2 *Notice of Withdrawals; Withdrawal Payment* of the Stockholders' Agreement provides:

Each Stockholder agrees to give Wakefern at least thirty (30) days' prior written notice of the happening of any of the following events (each a "Withdrawal"):

(i) a sale or other disposition for value of all or substantially all ShopRite supermarket business of such Stockholder in **a single transaction or series of related transactions;** or

(ii) the merger or consolidation of such Stockholder with or into another entity (irrespective of whether such Stockholder is the surviving or disappearing entity); or

(iii) the transfer of, or **any transaction or series of transactions** that have the effect of transferring a "controlling interest" in such Stockholder (for purposes hereof, a "controlling interest" in such Stockholder shall mean such interest as confers on the holder thereof the power to direct or cause the direction of the management and policies of such Stockholder). (emphasis added).

### a. End Result Test

James Toopes, Big V's President and CEO, conceded on cross examination that a tender of Big V's Wakefern stock followed shortly by a sale, merger or change in control to an unqualified successor would be a series of transactions obligating Big V for a withdrawal payment. He speculated that a lapse of twelve to eighteen months between the tender of Wakefern stock and the subsequent sale, merger or change of control might be sufficient to avoid the "series of transactions" language of the Stockholders' Agreement. This was not a recent consideration by Mr. Toopes and his colleagues at Big V. In fact, Mark Schwartz, the inventor of the Tender/Independent Scenario, together with Hunter

Boll[9] and Mr. Toopes, specifically planned to delay sale of Big V for some months following the tender of shares in order to minimize the risk of the "series of transactions" clause being applied.

Big V maintains that on April 17, 2000 it gave up its plans to sell the company and embarked on the Tender/Independent Scenario, but the evidence shows that Big V continued efforts to sell the company at least through August 2000. As detailed in the findings of fact above, after the April 17, 2000 board meeting and despite adopting a resolution purportedly terminating sale efforts, Big V continued to pursue sale or merger to Millennium Partners, Pathmark, Safeway, Ahold and Ceruzzi. Big V even tried to sell to Wakefern and a management-lead leveraged buyout was discussed as late as June 29, 2000. Big V's investment banker, PJS, kept seeking a buyer at Big V's request until late August 2000 after the C & S Supply Agreement was signed and Big V had consulted bankruptcy counsel. The Lee Funds' representatives on Big V's board participated in negotiating the Supply Agreement with C & S and provided for the "ultimate exit" in a "second transaction." The court finds that Big V has no intention of operating independently. To the contrary, the equity holders of Big V intend to sell or merge the company as soon as possible. The only reason for delay is to perpetuate the ruse that the Tender/Independent Scenario is not part of a series of transactions leading to the sale.

The end result of Big V's plans was always to sell and liquidate the Lee Funds' interest. The Tender/Independent Scenario was merely one step towards this end result. Under the end result test of the step transaction doctrine, this interim step may be disregarded. The end result is the sale of the company to an unqualified successor which obligates Big V for a withdrawal payment.

### b. Interdependence Test

Mr. Toopes testified at trial that Big V became increasingly dissatisfied with Wakefern for three reasons: (1) Wakefern maintains control over location and number of perspective store sites; (2) Wakefern's store operations systems are "inadequate" and not "state of the art"; and (3) Big V could be more profitable outside of Wakefern—specifically, a projected increase in profitability between $24–28 million a year. The court finds that these reasons are ex post facto rationalizations for the decision to leave Wakefern. The real reason was the scheme to avoid withdrawal liability and the side letter agreement, not any dissatisfaction with Wakefern.

The genesis of the Tender/Independent Scenario was the frustration of the Lee Funds in trying to cash out of their investment while avoiding the withdrawal obligation. Also, Thomas H. Lee Co. knew that it would have to increase its investment in Big V by $35 million under the side letter agreement by the third quarter of 2000. After fruitless efforts to sell to competitor Royal Ahold between 1996 and 1998, Big V brought in a new CEO, Mark Schwartz, in 1999. They also hired PJS at the end of 1999 to market the company again. The withdrawal obligation remained as an impediment to sale; yet the obligations of the side letter agreement loomed in the near future. Schwartz was determined to find a way around the with-

---

9. C. Hunter Boll is managing director of Thomas H. Lee Co. and has been a member of Big V's Board of Directors since 1990.

drawal liability. He conceived the Tender/Independent Scenario.

The evidence indicates that the Tender/Independent Scenario would not have been adopted by Big V without the plan to later sell the company. Leaving Wakefern to operate independently made no economic sense and was planned in a slipshod manner without adequate research and analysis. In fact, Big V trumpeted the value of its Wakefern membership to the investing public in its 10K and to potential investors in its offering memorandum. Giving up the benefits of Wakefern such as the ShopRite brand name, private label products, and promotional activities yielded uncertainty at best (which drove away investors) and potentially could damage Big V. Leaving Wakefern in defiance of Big V's bank lenders was foolhardy unless a sale was envisioned to pay off the banks. Despite the resolution to cease pursuing a buyer, efforts to sell Big V continued for months thereafter. Operating independently was never a goal but the means to an end.

### (i) No Economic Substance

The fact that the C & S Supply Agreement was a mere ruse as part of a grander scheme to dodge the withdrawal payment is borne out by the lack of economic substance. When Schwartz embarked on his plan he only negotiated with one alternate supplier, C & S. He told Toopes he contacted two other suppliers, but these were perfunctory. He didn't waste time getting proposals from competitors. He only needed one supplier. It defies reason that a retailer which purchases $700,000,000 of wholesale goods per year could not attract

more than one wholesaler to make a proposal.

In early April 2000, Big V's management prepared a financial analysis of the benefits of switching from Wakefern to C & S. That analysis assumed that C & S' s prices would be comparable to Wakefern's.[10] That assumption turned out to be incorrect. C & S's prices would be approximately $34 million higher than Wakefern's. Big V did not know this at the time the Board approved switching to C & S at the April 17, 2000 Board meeting, nor at the July 12, 2000 Board meeting, nor by August 3, 2000 when the C & S Supply Agreement was signed and the Board, by unanimous consent, approved it. It was only much later that Big V received C & S's item files containing price data. Not until after the bankruptcy filing on November 22, 2000 did Big V's management analyze the actual cost of goods with C & S and discovered that it would be $34 million higher.

Compare how Big V has been proceeding to investigate alternate suppliers since C & S canceled the Supply Agreement on June 1, 2001. Mr. Toopes testified that SuperValu and Fleming had provided item files (i.e., detailed costs) so Big V could compare the cost of goods sold. Big V neglected to get item files from C & S until after it signed the contract. Any business looking to switch suppliers would surely want to compare costs prior to leaping to another wholesaler. The fact that Big V leaped before it looked indicates cost savings was not its real motivation.

The analysis did not include a provision for fees charged by C & S for such things as fruit ripening, lack of manufacturer cash discount, labeling, ice cream handling,

10. Mr. Schwartz and Mr. Toopes met with Richard B. Cohen, President and CEO of C & S, in April or May of 2000. Mr. Cohen estimated that C & S's prices would be comparable to Wakefern's. It is not clear whether this meeting occurred before or after Big V prepared the analysis of the benefits of switching to C & S.

restocking, special deliveries, ASAP deliveries, drop trailers, trailer rentals or cardboard bails. All of those charges were known by May 3, 2000 when C & S delivered the first draft of its Supply Agreement but Big V did not amend its analysis of the economics of switching either for the July 12, 2000 board meeting or prior to signing the C & S Supply Agreement on August 3, 2000.

The analysis assumed that Big V would grow from 36 stores at the end of 1999, to 42 stores at the end of 2000, to 48 stores at the end of 2001 and, ultimately, 60 stores at the end of 2003. However, management projected running out of cash by mid-August 2000. Without new capital the growth plan was unattainable. That should have been evident by April 2000 and was a virtual certainty by July 2000. Despite this, the analysis of the economic benefits of switching from Wakefern to C & S was not changed for the July 12, 2000 board meeting or prior to signing the C & S Supply Agreement on August 3, 2000.

Only after this litigation was in progress did Big V's management concoct the rationalization that the extra costs of goods incurred with C & S would be offset by vendors' allowances. The information Big V's management had on vendor's allowances was imprecise and anecdotal, at best. It defies credibility that sophisticated management would base a major transaction on a projected $60 million benefit through vendor's allowances without any written commitments from vendors or documentation whatsoever. On the other hand, Wakefern presented competent evidence that Big V's projections of annual vendor's allowances was more than double industry standards.

### (ii) Forfeiture of ShopRite Brand Value

Members of the Wakefern cooperative enjoy many benefits in operating their businesses including volume purchasing power, management consulting, administrative services, marketing, advertising, and financing. The most significant benefit is the ShopRite trade name and ShopRite private label products. Leaving Wakefern would mean losing the purchasing power of Wakefern and all the other services whose costs are shared among Wakefern's members; and it would mean giving up the ShopRite brand. Big V acknowledged the value of the ShopRite brand. The offering memorandum assembled by PJS to present to potential investors states:

The Company has built a reputation for price and value leadership by offering both low-price, national brand and private label ShopRite® merchandise. As a member of Wakefern, Big V benefits from over $5.5 billion in purchasing power, one of the leading private label programs in the United States and extensive advertising and promotional programs connected with the ShopRite® name.

Big V is the largest member of Wakefern, the nation's largest cooperative food wholesaler. Its members operate approximately 195 stores in the Northeast, principally under the ShopRite® name, and generate annual retail sales in excess of $7.0 billion. ShopRite® supermarkets, in aggregate, have the leading market share in the New York Metropolitan Region and the name is one of the most widely recognized in the region. Membership in Wakefern provides the Company economies of scale in its merchandise purchasing, computerized warehouse and distribution efficiencies and a large scale advertising presence. Wakefern provides its members with year-end patronage dividends, financial incentives to open new stores,

and the ShopRite® private label line. These economies of scale allow the Company to offer merchandise and service departments at or below competitors' prices while generating better operating margins.

Big V derives 25% of its sales from the ShopRite® Private Label products. These generally produce a higher profit margin than national brands.

Big V extolled the virtues and value of the ShopRite® Private Label in its offering memorandum drafted by PJS.

*Strength of Private Label—ShopRite®.* Big V's enormously successful and extensive private label program is one of its key strengths. Wakefern's ShopRite® brand label, which comprises approximately 3,600 items, currently accounts for approximately 25% of the total sales of categories and departments impacted. The private label penetration is expected to increase to approximately 28% over the next few years. ShopRite's private label penetration and performance is clearly superior compared to the industry average of 16%. The ShopRite® name has developed into a regional brand name which customers associate with quality and value for a wide variety of products. Further shifting of its sales mix toward private label merchandise will allow the Company to soften the impact of its lower gross margin strategy.

The ShopRite® private label has the characteristics of a regional name with high name recognition and a strong quality image among consumers within the Hudson River Valley Region.

All members of Wakefern benefit from its regional promotional activities. Again, Big V explained to potential purchasers the value of Wakefern's cooperative efforts in the PJS memorandum.

Big V's advertising strategy is coordinated with other Wakefern members and emphasizes its variety of high quality perishables, broad selection of nationally advertised brand name products, 2,500 weekly sale items and extensive selection of ShopRite® private label merchandise.

Big V achieves significant economies of scale through its use of Wakefern's advertising programs, particularly those using radio and television in the New York Metropolitan area that would be too costly for most of the Company's regional competitors to use. Most of the Company's advertising is developed and placed by Wakefern's advertising agency and is tailored to the Company's specific needs in the market it serves.

Wakefern has special promotional programs, such as the annual "Can–Can" sale which Big V lauded.

The Company's advertising efforts are enhanced by its promotional and targeted marketing. Big V has several programs designed to inspire customer loyalty including the "Half–Price" and "Can–Can" promotions that enhance in a memorable way in customers' mind the Company's price and value leadership. "Can Can" is a highly successful three-week promotion which has occurred every January for the last 27 years. "Can Can" is broadly recognized throughout the New York Metropolitan area for offering customers the opportunity to buy a wide variety of deeply discounted cases of canned goods. The "Half Price" promotion is done twice a year and is typically applied to over 500 SKUs and 150 staple food products.

Wakefern developed the Price Plus Card used by all member stores. Customers present the Price Club Card at the register and receive favorable prices. Big V

described this in the PJS offering memorandum as follows:

Targeted marketing is another important element of Big V's promotional strategy. The highly successful Price Plus card, as part of the frequent shopper program, is the main vehicle for this targeted marketing. The Price Plus card may also be combined with a co-branded MasterCard™ which offers check cashing capabilities, a 1.0% rebate at ShopRite® stores and a 0.5% cash rebate on all other purchases. There are approximately 700,000 Price Plus cardholders and approximately 85% of total transactions are made with this card. The Price Card card gives the Company the ability to track customers' purchase histories, to communicate frequently with customers and to recognize when they change their shopping habits. The card is linked to the in-store Catalina Coupon System, allowing Big V to instantly reward customers at the point of sale with coupons targeted to their purchases. One use for the Price Plus card is to send historically high volume shoppers incentive coupons to shop Big V stores during a period that coincides with the opening of a competitor's store. This often mitigates any impact a new store in a Big V market might have on the Company.

If Big V were to leave Wakefern it would have to invest in its own frequent customer card and the computer hardware and software to effectively use the database. In fact, Big V had one million blank cards printed at a cost of $300,000 in anticipation of switching to its own card program. Exclusion from Wakefern's Price Plus Card program would be a major loss to Big V and creating its own card program would be a major expenditure.

Big V summarized the benefits of its membership in the Wakefern cooperative in the PJS offering memorandum.

### Wakefern Food Corp.

Big V is the largest member of Wakefern with an approximate 19% ownership interest. Wakefern is the nation's largest cooperative food wholesaler. Wakefern purchases large quantities and varieties of products at favorable prices that it passes on to its members. There are presently 43 individual member companies and 204 supermarkets that comprise the Wakefern cooperative. The principal benefits to the Company from its relationship with Wakefern are volume purchasing, ShopRite® private label products, distribution and warehousing on a cooperative basis, ShopRite® advertising and promotional programs, and the use of the ShopRite® name and trademark. The ShopRite® name is widely recognized by customers throughout the Company's trade area. As part of its agreement with Wakefern, the Company is required to purchase a minimum of 85% of those products offered by Wakefern.

Big V's membership in Wakefern allows it to benefit from many of the economies of scale in purchasing and distribution associated with chains of greater size and geographic reach. Approximately 80% of Big V's total purchases during fiscal 1999 were delivered to stores from the Wakefern distribution center with the remaining 20% delivered directly to stores by vendors. Wakefern operates four warehouse and distribution facilities in Elizabeth, Raritan and South Brunswick, New Jersey and Wallkill, New York. The Wallkill facility is a state-of-the-art, 730,000 square foot building centrally located near Big V's stores. A majority of Big V's grocery, dairy, frozen food, commercial bakery, meat, produce and deli items are deliv-

ered to stores from the Wallkill facility. The proximity of these facilities to Big V's stores, combined with Big V's efficient order system, shortens the lead time between the placement of a merchandise order and its receipt and allows for seven days a week deliveries.

Wakefern assists its members in their site identification by providing market research, volume projections and projections of the impact of the proposed market on existing member supermarkets in the area. Leveraging the information provided by Wakefern, the Company is able to conduct its own site selection process and extensive market research. Wakefern offers financial incentives to its members opening stores in prescribed areas. Many of the Company's planned locations would qualify for such incentives.

Wakefern distributes as a patronage dividend to each of its stockholders a share of the earnings of each product department of Wakefern in proportion to the dollar volume of business done by the stockholder with that product department of Wakefern during each fiscal year. Big V's aggregate patronage dividend from Wakefern was $9.4 million in fiscal 1999, $9.3 million in fiscal 1998 and $8.8 million in fiscal 1997. These dividends are included in the Company's gross margin in its audited financial statements.

The obligations of Big V (and of other Wakefern members) to Wakefern are set forth in an agreement which includes, among other things, significant penalties on the part of the terminating member. The Wakefern agreement requires the Company to obtain approval from Wakefern prior to any change of control at the Company, and provides for a significant penalty payment to Wakefern if approval is not granted.

Big V's investment banker, PJS, told management that the uncertainty of Big V's operations outside of Wakefern discouraged potential financial investors. Big V's board approved leaving Wakefern without any analysis of the impact of losing the ShopRite brandname and private label products. At trial Big V presented no evidence to contradict the fact that giving up the ShopRite trademark would be a great loss to Big V. Yet Big V embarked on a campaign to leave Wakefern forfeiting all the benefits of the ShopRite trade name. Why? The only sensible conclusion is that Big V was willing to forfeit the benefits of ShopRite membership solely to avoid the withdrawal payment.

### (iii) Defiance of Bank Group

Big V persisted in its plan to leave Wakefern and transition to C & S despite the lack of consent by its bank group. A Memorandum of Understanding among investor, John Childs Associates, Lee Company, C & S and Big V dated July 6, 2000 stated that one of the conditions of proceeding with C & S was agreement by the bank group to Big V's leaving Wakefern. Again in a memo to Bill Hamlin of C & S Mr. Toopes states: "We understand that we need to obtain permission from the existing bank group to exit Wakefern ..." No responsible corporate management would knowingly defy its major lenders and risk an acceleration of its debt unless it was desperate. Thomas H. Lee Co. was desperate to avoid the side letter agreement and proceeded in spite of the bank's disapproval. Big V's management tried to placate the banks by promising to pay off the debt in 12 to 18 months from the planned sale of Big V.

### (iv) Sale Efforts Continue

Big V asserts that it ceased looking to sell the company in April of 2000 and,

instead, embarked on the Tender/Independent Scenario. The court finds as a fact that Big V never terminated its efforts at sale. Rather, an immediate sale remained Big V's goal, but the withdrawal payment was the major impediment. At the April 17, 2000 board meeting, Big V's directors unanimously approved a resolution relating to Wakefern. The resolution (quoted above) provides, inter alia:

[A]n acquisition by a third party was not a realistic alternative . . .

Whereas; [T]he Board has determined that it is no longer in the best interest of Big V to pursue a sale of the Company;

. . .

Whereas; the Board is no longer considering such a sale

Resolved, that the Board is no longer considering or pursuing a Sale of Big V

The court finds that this resolution was an attempt (and a feeble one at that) to create a paper trail in order to avoid the withdrawal payment. The reality that Big V never stopped pursuing a sale of the company is borne out by several facts including the minutes of the same April 17, 2000 Board meeting in which the Board agreed to continue discussions with Millenium Partners regarding a Letter of Intent to acquire Big V's stock for $310 million. At the same April 17, 2000 meeting the board approved a General Business Plan and Timeline which projected accepting an offer from Stockbridge Partners and closing by the end of June 2000. It also projected consummating discussions with Pathmark for a possible merger. Furthermore, the agenda for the Board's July 12, 2000 meeting calls for a report on "Prospective Acquirer." As mentioned above, sale efforts to Wakefern, Safeway, Pathmark, Ahold, Ceruzzi, and a management buyout all continued after the resolution of April 17, 2000 quoted above. Big V continued to seek a buyer through PJS. It

was not until after Big V had signed the C & S Supply Agreement on August 3, 2000 and retained bankruptcy counsel later that month, that Big V told PJS to stop trying to sell the company in late August 2000.

Big V's actions during the drafting of the C & S Supply Agreement show that a sale of Big V was contemplated not just sometime in the future, but as soon as the "series of related transactions" clause could be avoided. Big V's management gave drafts of the C & S Supply Agreement to Mr. Ceruzzi for his review and pressed for changes sought by him. C & S knew Ceruzzi because some of his supermarkets are C & S customers. Indeed, C & S knew that Ceruzzi was involved in negotiating the Supply Agreement anticipating his later involvement in the sale of Big V's stores. The C & S Supply Agreement had a 15–year term with a substantial withdrawal payment imposed on Big V; however, an exemption from the withdrawal payment was granted in the event Big V was sold to a C & S customer. Stop and Shop, Royal Ahold's subsidiary, is a C & S customer and does business with Ceruzzi. Thus, the stage was set for Big V to sell to Ceruzzi who could then flip the stores to Stop and Shop.

### c. Binding Commitment Test

The facts in the case at bar fail to meet the binding commitment test. As the case law states, the binding commitment test is seldom applied. Big V's interrelated transactions discussed in the immediately proceeding section had not reached the stage of a binding commitment.

### d. Summary

Under both the end result test and the independent test, the Tender/Independent Scenario was merely a step in a series of transactions leading to the sale of Big V. Operating independently from Wakefern

serves no purpose for Big V other than creating a pretext to evade the withdrawal payment. Eventual sale of Big V is not merely a future possibility following independence, it is the reason to seek independence. The Tender/Independence Scenario is inextricably tied to a subsequent sale of Big V as soon as possible. It is a "series of related transactions" within the meaning of Section 2.2 of the Stockholders' Agreement and obligates Big V for a withdrawal payment.

### 3. Tender/Independent Scenario is Withdrawal

■ While the court is convinced that the Tender/Independent Scenario is merely one step in a series of transactions leading to the sale of Big V, the court will consider whether the Tender/Independent Scenario alone obligates Big V for the withdrawal payment. In accordance with the principles of contract construction recited above, the court will endeavor to discern the intent of the parties.

> "The polestar of [contract] construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded."

*Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 301, 96 A.2d 652, 656 (1953), *quoted in Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City*, 674 F.2d 1001, 1007 (3d Cir.1982). What did the parties intend regarding the Tender/Independent Scenario? In light of the facts and circumstances, the court perceives three alternatives:

1. The parties intended that the Tender/Independent Scenario would ob-
ligate the departing member for a withdrawal payment;

2. The parties intended that the Tender/Independent Scenario would *not* obligate the departing member for a withdrawal payment; or

3. The parties failed to consider the Tender/Independent Scenario.

The court finds that alternative number one, that the Tender/Independent Scenario would trigger a withdrawal payment, is the most likely and, in fact, is what the parties intended. Thomas Infusino, Wakefern's Chairman and CEO, who has been with the cooperative for over 50 years, testified in detail about the departure of Supermarkets General Corp. from the Wakefern cooperative in 1966 to 1968 to operate independently under the Pathmark name. The loss of a significant percentage of volume threatened the cooperative. Eleven years later when the first Stockholders' Agreement was signed in 1979, the members surely contemplated avoiding a repetition of the impact on the cooperative of a member's withdrawal to operate independently as had occurred with Pathmark. That must have been foremost in their minds having so recently survived the Pathmark departure. As Mr. Infusino testified,

> Well, the purpose of the agreement was to avoid what happened to us when the Pathmark people left us. The diminution of our volume. Because without the ability to assure lenders that we would have the resources, which really comes from the volume that your company is going to enjoy, there was no way that we were going to be able to borrow the kind of money we needed.

Alternative two, that a Tender/Independent Scenario would *not* trigger a withdrawal payment obligation, is highly unlikely in light of the Pathmark disaster. The court can perceive no significant prac-

tical difference for Wakefern between a member's selling out to a competitor and a member's withdrawing to operate independently. In either case Wakefern would lose the wholesale volume and would have a competitor in the market area. Big V introduced no testimony or other evidence to show that the parties intentionally excluded the Tender/Independent Scenario from withdrawal liability.[11] Moreover, Big V presented no argument as to why the parties would have wanted to allow a member to leave the cooperative and operate as a competitor without compensating the cooperative. Big V's only argument is that since Article IX, Section 5 of the By Laws specifically provides for mandatory repurchase of any member's Wakefern stock, and since the Stockholders' Agreement fails to specifically mention this put option under the By Laws as an event of withdrawal, there should be no withdrawal payment for tendering shares under the By Laws. The court finds that the parties never intended that the Tender/Independent Scenario should allow a member to depart free of a withdrawal payment.

The third alternative, that the parties neglected to consider the Tender/Independent Scenario, is also highly unlikely in light of the Pathmark experience. In response to an inquiry by the court, plaintiff's counsel asserted that the Tender/Independent Scenario was never considered.

> **Mr. Greiner:** Your Honor, I think the evidence has been, and I think the deposition testimony is reasonably clear. This issue of the possible transition to another supplier, under Article 9, and a tender of stock under Article 9, Section 5, simply was not discussed at any time.

According to plaintiff, since the Stockholders' Agreement does not specifically mention the Tender/Independent Scenario, it is not prohibited. Below, the court will discuss whether withdrawal liability might be implied where it is not specifically addressed in the agreement.

The parties' intention that a Tender/Independent Scenario would give rise to a withdrawal payment is evidenced by several things. The language of the Stockholders' Agreement states its primary purpose to preserve the economics of the volume purchasing of the members combined:

> A. Wakefern is a corporation operated on the cooperative plan and the Stockholders are retail merchants, primarily dealing in consumer products for home use **and deriving mutual economic and merchandise assistance from Wakefern;** and . . .
>
> C. **Wakefern's viability is based primarily on the volume generated by aggregating the purchasing power of all of the Stockholders;** and . . .
>
> D. The Board of Directors of Wakefern and the Stockholders believe it is in Wakefern's and each of the Stockholder's best interest that the Stockholders continue to purchase their supplies and inventory from Wakefern; . . . .

Preamble to Stockholders' Agreement dated August 20, 1987 as amended February 20, 1992 (emphasis added).

Several Wakefern directors, including David Bronstein of Big V, confirmed their intention in a certification filed in state court in the Consolidated litigation: "This is the cornerstone for the entire structure. This requirement prevents members from switching suppliers in response to changing market conditions, and thereby from leaving the cooperative in the lurch."

---

11. In fact, Big V introduced no evidence regarding the context in which the documents were executed or how the parties have operated thereunder to aid the court in interpretation.

Consolidated Certif. ¶ 13. In addition, the certification states:

> Just as important, if any member can effectively walk out of the cooperative at any time without payment, then it will be difficult if not impossible for Wakefern to obtain additional financing. No bank or institution will lend Wakefern tens of millions of dollars of unsecured financing on favorable terms without the assurance that the co-op will continue to operate in the future with the necessary volume to pay off loans.

Consolidated Certif. ¶ 34.

■ Big V represented to the Securities and Exchange Commission as well as its own investors and potential investors that it had an evergreen ten-year commitment to Wakefern. In its Report on form 10–K filed with the SEC on December 25, 1999, Big V states,

> The Wakefern Warehouse Agreement contains an evergreen provision providing for a continual 10–year renewal period. The Company's obligation may be terminated only 10 years following the approval of such termination by the holders of at least 75% of the outstanding voting stock of Wakefern....

"External indicia of the parties' intent other than written words are useful, and probably indispensable, in interpreting contract terms." *Mellon Bank, N.A. v. Aetna Bus. Credit,* 619 F.2d 1001, 1010 (3d Cir.1980).

Additional evidence of the parties' intention was provided by executive officers of Wakefern. Kenneth Jasinkiewicz, Wakefern's Vice President and Chief Financial Officer, testified concerning his dealings with prospective new members of the cooperative. Over the past ten years he has met with dozens of prospective members and successfully brought in ten to fifteen new members. His practice included explaining to new members the Stockholders' Agreement, especially the ten-year evergreen provision, the minimum patronization requirement, and the withdrawal payment. He related that each new member who signed the Stockholders' Agreement expressed [12] an understanding of the commitment to purchase from Wakefern and the withdrawal liability if that commitment was not met.

Dean Janeway, President and Chief Operating Officer of Wakefern, testified about his dealings with prospective members as well; however, his explanation of the Stockholders' Agreement preceded signature by a new member by six to twelve months. Mr. Janeway also related statements by several members at the time the Stockholders' Agreement was amended in 1992 to the effect that the intent and purpose of the agreement was to preserve the volume purchasing of the cooperative. These statements added to the existing evidence of the parties' intent expressed primarily in the preamble to the Stockholders' Agreement, the Consolidated Certification by Wakefern's board members (including Big V) and Big V's own public filing with the SEC.

■ The understanding of the Stockholders' Agreement by the senior management of Wakefern and the manner in which they implemented the agreement among existing and new members can provide insight to the intention of the parties at the time the agreement was made.

> Where a contract is ambiguous, courts will consider the parties' practical construction of the contract as evidence of

**12.** Testimony regarding statements by new members at the time they signed the Stockholders' Agreement was admitted, over objection, under FED.R.EVID 803(3) as the declarant's then existing state of mind or intent.

their intention and as controlling weight in determining a contract's interpretation; where the terms of a contract are clear, however, the court must enforce it as written.

*County of Morris v. Fauver,* 153 N.J. 80, 103, 707 A.2d 958, 969 (1998). Furthermore, the actions of Big V's management and directors show their understanding that leaving Wakefern would obligate Big V for a withdrawal payment. Several witnesses, including Mr. Toopes, described meetings among executives and board members of both Big V and Wakefern where the primary topic was the amount of Big V's withdrawal liability. While they might have challenged the calculation of the amount due, no one at Big V questioned the fact that withdrawal liability would be due unless Big V were replaced in the cooperative by a qualified successor.

Having reached the firm conclusion that the signatories to the Stockholders' Agreement intended that a Tender/Independent Scenario would engender a withdrawal liability, the next question for the court is did the scrivener [13] of the Stockholders' Agreement accurately express that intention in writing? If the language of the contract adequately expresses the parties' intent, the court's role is to enforce it. On the other hand, if the written document is inadequate, may the court, nevertheless, supply the missing term by inference or operation of law?

### a. "Sale or Other Disposition"

The court accepts Wakefern's position that Section 2.2(i) of the Stockholders' Agreement is broad enough to cover the Tender/Independent Scenario. That section provides, inter alia, that a "sale or other disposition for value of the ShopRite supermarket business" is a withdrawal. By tendering its shares in Wakefern, Big V would forfeit its right to use the ShopRite trademark and could no longer operate as a ShopRite supermarket. In effect, Big V would be abandoning its ShopRite supermarket business.

Abandonment is a form of disposition within the meaning of the phrase "sale or other disposition" in the Stockholders' Agreement. For federal income tax purposes, gain or loss is computed upon the "sale or other disposition" of property. 26 U.S.C. § 1001.[14] "However, it does not take a sale to recognize income: any 'disposition' is sufficient." *L & C Springs Assoc. v. Commissioner,* 188 F.3d 866, 868 (7th Cir.1999). For example, if a taxpayer abandons property, then the taxpayer is required to recognize gain on that property. I.R.C. § 1001; *See also Middleton v. Commissioner,* 77 T.C. 310, 320–21, 1981 WL 11281 (1981), *aff'd per curiam,* 693

**13.** Technically, a scrivener (derived from the Latin *scribus* ) is merely a copyist or amanuensis, not a legal drafter. BRYAN A. GARNER, THE LAWYER'S REFERENCE SHELF· A DICTIONARY OF MODERN LEGAL USAGE (Oxford University Press 1995). In *Bartleby the Scrivener,* Herman Melville described a scrivener as "a mere copyist"—"[c]opying law papers being proverbially a dry, husky sort of business." Herman Melville, *Bartleby the Scrivener. A Story of Wall-street,* ¶ 14, in Putnam's Monthly (G.P. Putnam & Co. 1853). Today, the term is used broadly to refer to include one whose occupation is to draw contracts and prepare other types of written instruments. BLACK'S LAW DICTIONARY 1347 (6th ed.1990).

**14.** The term "sale or other disposition" has been included in the Internal Revenue Code and the regulations thereunder since their inception. *Palmer v. Commissioner,* 302 U.S. 63, 69, 58 S.Ct. 67, 82 L.Ed. 50 (1937). "The dictionary definition of 'disposition' is the meaning one usually attributes to the word. It is 'The getting rid, or making over, of anything; relinquishment;' " *Herbert's Estate v. Commissioner,* 139 F.2d 756, 758 (3d Cir. 1943).

F.2d 124 (11th Cir.1982); *L & C Springs Assoc.,* 188 F.3d at 868.

Just as an abandonment is a disposition for tax purposes, so too would the abandonment or relinquishment by Big V of its ShopRite supermarket business constitute a "sale or other disposition" under Section 2.2(i) of the Stockholders' Agreement. Value is provided by Wakefern's obligation under the By–Laws to pay an amount equal to Big V's capital contribution. Thus, tendering its shares in Wakefern would constitute a sale or other disposition for value of Big V's ShopRite supermarket business within the meaning of Section 2.2(i) of the Stockholders' Agreement.

Big V could avoid withdrawal liability if its ShopRite supermarket business were disposed of to a qualified successor. In other words, if another member or subsidiary of Wakefern were to operate Big V's stores under the cooperative, there would be no loss of volume. Big V now asserts that if abandonment is a disposition, its ShopRite supermarket business reverts to Wakefern, who is a qualified successor. Big V adopted this theory mid-trial after the court inquired of Wakefern's counsel where Big V's ShopRite supermarket business would go after disposal. He surmised back to Wakefern. Actually, by law abandoned property goes to no one.

"Abandoned property" is that to which the owner has voluntarily relinquished all right, title, claim and possession, with the intention of terminating his ownership, **but without vesting ownership in any other person,** and with the intention of not reclaiming any future rights therein. Or, as sometimes stated, the term "abandonment," as applied to personal property and property rights, means the act of voluntarily and intentionally relinquishing a known right, absolutely, and **without reference to any particular person or for any particular purpose.**

1 AM.JUR. 2d, *Abandoned, Lost, and Unclaimed Property* § 1 (1994) (emphasis added). Title may be acquired by various means such as finding (*see* N.J. STAT. ANN. 40A:14–157) but abandoned property is not transferred directly to anyone from the prior owner. In this case, were Big V to abandon its ShopRite supermarket business, no one would be operating a ShopRite supermarket business in Big V's various trade areas.

By tendering its shares, forfeiting its rights to use the ShopRite name or to purchase ShopRite private label goods and entering into a supply agreement with another wholesale grocer, Big V would be disposing of its ShopRite supermarket business for value without having a qualified successor. Thus, Big V would be obligated for a withdrawal payment under the Stockholders' Agreement. Although the Stockholders' Agreement defines the signatories as "Stockholders", surrender of a signatory's shares in Wakefern does not cancel its obligations under the Stockholders' Agreement. In other words, Big V's change in status from stockholder to former stockholder does not mean it no longer has to honor its commitments to the cooperative. As quoted above, Big V told the world that it had an ongoing ten-year minimum commitment to Wakefern in its 10–K filed with the SEC on December 25, 1999. Holding Big V to this commitment is not only consistent with the manifest intent of the parties, it is consistent with Big V's own expressed understanding of its obligations to the cooperative.

#### b. Omitted Terms

■ Big V's position is that Article IX, Section 5 of the By–Laws specifically provides a procedure for members to terminate their relationship with the cooper-

ative; and that the Stockholders' Agreement carefully defines withdrawal, but does not specify a tender of stock as a withdrawal. Therefore, says Big V, no withdrawal payment would be due under the Tender/Independent Scenario because the Stockholders' Agreement fails to address it. Considering the possibility, however remote, that the parties overlooked the Tender/Independent Scenario when drafting the Stockholders' Agreement, the court holds that the omitted provision may be supplied by the court in order to give effect to the parties' intentions and to avoid an unanticipated, undesired result, which would render the Stockholders' Agreement virtually worthless.

### (i) Big V's Implied Contractual Obligation

■ There are conflicting principles of contract construction. One states that the court cannot make a better contract for the parties. *See, e.g., James v. Federal Ins. Co.,* 5 N.J. 21, 24, 73 A.2d 720, 721 (1950) ("The law will not make a better contract for parties than they themselves have seen fit to enter into, or alter it for the benefit of one party and to the detriment of the other. The judicial function of a court of law is to enforce the contract as it is written.") (internal citations omitted). The other principle holds that omitted terms may be implied in the agreement or supplied by the court to carry out the intent of the parties and avoid rendering the agreement nugatory. *See, e.g., New Jersey Bank v. Palladino,* 77 N.J. 33, 46, 389 A.2d 454, 461 (1978)("(t)erms will be implied in a contract where the parties must have intended them because they are necessary to give business efficacy to the contract as written.").

■ Cases under the first principle leave the parties where they are within the four corners of the agreement. A well

warn axiom of contract law is that "when a contract is clear, the court is bound to enforce its terms as they are written." *Camden Iron and Metal, Inc. v. Bomar Res., Inc.,* 719 F.Supp. 297, 305 (D.N.J. 1989) (citing *Washington Constr. Co. v. Spinella,* 8 N.J. 212, 84 A.2d 617 (1951)). In these cases, while the result may leave one or more parties disappointed, they do not result in a total evisceration of the agreement. In *Bomar,* the court also stated:

> However, in a *casus omissus* . . . where the four corners of the parties written agreement fail to provide for the dispute at hand, it is up to the court to fill the gap left by the contracting parties. . . . Terms, although not specifically set forth, may be implied where the parties must have intended them because they are necessary to give business efficacy to the contract as written, or to give the contract an effect which the parties, as fair and reasonable, presumably would have agreed on if, having in mind the possibility of the situation which has arisen, they contracted expressly in reference thereto.

*Bomar,* 719 F.Supp. at 306 (citing *Berkeley Dev. Co. v. Pacific Tea Co.,* 214 N.J.Super. 227, 240, 518 A.2d 790 (Law Div.1986)). "The implied covenants and terms of a contract are as effective components of the agreement as those expressed." *Aronsohn v. Mandara,* 98 N.J. 92, 100, 484 A.2d 675 (1984).

The more liberal view espoused by such respected authorities as the Restatement (Second) of Contracts and Professor Farnsworth is that the court may supply missing terms in order to give effect to the parties' agreement. Every law student is aware of the tradition of the common law courts to supply missing terms where the essentials of the contract are otherwise present. For example, if no time of deliv-

ery is specified in a contract for sale of goods the court will imply a reasonable time. RESTATEMENT (SECOND) OF CONTRACTS § 204 (1979); E. FARNSWORTH, CONTRACTS § 7.16, at 523 (1982).

The New Jersey Supreme Court has had several occasions to consider whether omitted terms may be supplied by implication. In *Onderdonk v. Presbyterian Homes of New Jersey,* 85 N.J. 171, 425 A.2d 1057 (1981), the court gave a thorough explanation of the law in this regard:

> Arrangements embodied in a contract may be such that the parties have impliedly agreed to certain terms and conditions which have not been expressly stated in the written document. *Bak-A–Lum Corp. v. Alcoa Bldg. Prod.,* 69 N.J. 123, 351 A.2d 349 (1976) ... Some principles have been utilized to define those implications. Thus we have held that "(t)erms will be implied in a contract where the parties must have intended them because they are necessary to give business efficacy to the contract as written." *New Jersey Bank v. Palladino,* 77 N.J. 33, 46, 389 A.2d 454 (1978) ... As a corollary to that proposition it is certainly reasonable to imply that neither party to a contract shall injure the right of the other to receive the fruits of the agreement ...

> There are also some situations in which a condition will be implied "on grounds of fairness and justice." 3A CORBIN ON CONTRACTS § 670, at 159–160 (3d ed. 1961) ... In *Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 118 N.E. 214 (Ct. App.1917) Justice (then Judge) Cardozo said ... "The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed ..."

> In determining under contract law, what covenants are implied, the object which the parties had in view and intended to be accomplished, is of primary importance.... It is of course not the province of the court to make a new contract or to supply any material stipulations or conditions which contravene the agreements of the parties ... Terms are to be implied not because "they are just or reasonable, but rather for the reason that the parties must have intended them and have only failed to express them * * * or because they are necessary to give business efficacy to the contract as written, or to give the contract the effect which the parties, as fair and reasonable men, presumably would have agreed on if, having in mind the possibility of the situation which has arisen, they contracted expressly in reference thereto. *See* 12 Am.Jur., Contracts, sec. 329; 14 Am.Jur., Covenants, Conditions and Restrictions, sec. 14."

> Central to this inquiry of ascertaining what, if any, terms are implied is the intent of the parties. Intent may be determined by examination of the contract and in particular the setting in which it was executed. In *Atlantic Northern Airlines, Inc. v. Schwimmer,* Justice Heher pointed out that ... "[T]he polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest of intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded." (12 N.J. at 301, 96 A.2d 652)

*Onderdonk,* 85 N.J. at 182–185, 425 A.2d at 1062–63, (internal citations omitted), *cited with approval in Barco Urban Renewal*

*Corp. v. Housing Auth. of Atlantic City,* 674 F.2d 1001, 1007 (3d Cir.1982). In *Barco,* the Third Circuit stated:

> When parties to a contract in a commercial setting fail to specify terms that are essential to a determination of their respective legal obligations, courts imply the omitted terms. Terms are not implied because they are just or reasonable, but rather for the reason that the parties must have intended them and have only failed to express them ... or because they are necessary to give business efficacy to the contract as written, or to give the contract the effect which the parties, as fair and reasonable men, presumably would have agreed on if, having in mind the possibility of the situation which has arisen, they contracted expressly in reference thereto
>
> ...
>
> [This] requires an inquiry into the circumstances surrounding the formation of the contract, its purpose, community standards of fairness, and public policy ... Under New Jersey law ... [t]he polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, ... the attendant circumstances ... are necessarily to be regarded.

*Id.* (internal citations omitted).

Considering the intent of the parties as expressed in the Preamble to the Stockholders' Agreement and the Consolidated Certification, the attendant *circumstances* such as the Pathmark defection and financing undertakings, as well as the objects to be achieved, namely preservation of the cooperative, the court will infer that the Tender/Independent Scenario is a withdrawal from the cooperative obligating Big V for the withdrawal payment.

In this case, all the evidence supports the parties intention to bind themselves to a cooperative and to permit departure only if the volume purchasing is replaced or upon payment of an exit fee. If the Tender/Independent Scenario was not explicitly covered in the Stockholders' Agreement, the court should imply that the parties intended to treat it like other analogous circumstances such as sale, merger or change in control. From the cooperative's perspective, the Tender/Independent Scenario has the same effect as sale, merger or change in control to an unqualified successor—i.e., the wholesale volume of the departing member is lost and there arises a new competitive store in the marketplace.

If any member could leave by adopting the Tender/Independent Scenario devised by Big V, the mandatory patronage requirement and withdrawal payment provisions would be rendered virtually meaningless. Any member planning a sale, merger or change of control to an unqualified successor would require only sufficient advance planning to make it appear that the subsequent sale was not part of a "series of transactions" to avoid the restrictions to which all members of the cooperative bound themselves. To give full effect to the intent of the parties and to avoid a result which would render the Stockholders' Agreement worthless, the court implies that the Tender/Independent Scenario proposed by Big V obligates Big V for the withdrawal payment.[15]

---

**15.** Big V contends that if it is not permitted to tender its shares and operate independently, Section 5, Article IX of the By–Laws is rendered meaningless. While it may be difficult to reconcile the seemingly unfettered right of a stockholder to put its stock back to Wakefern with the withdrawal payment under the Stockholders' Agreement, logically there is no inconsistency. One may leave the cooperative, but there is a price. Alternatively, a

### (ii) Other Cooperative Cases

██ If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left.

1 CORBIN, CONTRACTS, § 95, at 400 (1963) (cited in *Paley v. Barton Sav. & Loan Ass'n*, 82 N.J.Super. 75, 83, 196 A.2d 682, 686 (App.Div.1964)). An unexpressed promise can be put in by construction of law when "justice imperiously demands it under the circumstances that have arisen." *HML Corp. v. General Foods Corp.*, 365 F.2d 77, 82 (3d Cir.1966) (citing 3 CORBIN, CONTRACTS § 569, at 339–41 (1960)).

At least one case which has addressed the issue of an unexpressed promise in the context of a cooperative/member relationship is instructive. In *Tri–State Generation and Transmission Assoc., Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346 (10th Cir.1989), the court held that members of a wholesale power and energy cooperative had an implied obligation to maintain requirements and remain in business throughout the term of the requirements contract, even though this supposition was not explicitly expressed in the contract. Shoshone River Power, Inc. was a member of the Tri–State electrical power cooperative. As a result of a lower than projected demand for electrical power, there was an oversupply of electric power and "[i]n the early 1980's, Tri–State found itself with stagnant demand, excess capacity, enormous debts to be repaid, and increasing rates being charged to its members." *Id.* at 1350.

Stymied by a change of economic conditions, Shoshone entered into a Memorandum of Understanding with PacifiCorp, an investor-owned utility. Pursuant to the Memorandum, PacifiCorp offered to purchase substantially all of Shoshone's assets—a sale that was subsequently approved by Shoshone's members. In response, Tri–State brought an action to recover monetary damages and to enjoin the sale of Shoshone's assets to Pacific. Tri State claimed that it was a breach of Shoshone's obligations under the all-requirements contract to sell its assets to Pacific "without making provision for the purchase of electric power from Tri State throughout the remaining term of the contract." *Id.* On the other hand, Shoshone argued that the sale of its assets and the ceasing of it business operations did not breach its obligations under the contract because, "a sale, which is not expressly prohibited under the contract, would eliminate any power requirement Shoshone may have had under the contract." *Id.*

Ultimately, the United States Court of Appeal for the Tenth Circuit reversed the trial court's finding and held that Shoshone would be in breach of its requirement contract with Tri State if it decided to purchase power from PacifiCorp. The court reasoned as follows:

[I]t is clear from the record that the all-requirements contract and the entire enterprise of the parties in this case are based on the continuance of the contract throughout the agree-upon term, especially in light of the cooperative nature of the Tri–State system, the role the all-requirements contract plays in the cooperative venture, and the participation and interrelationship of the individual cooperatives. Clearly, the fulfillment of

member may sell to a qualified successor which is, historically, how other members

have left Wakefern, including Big V's founder, William Rosenberg.

Tri–State's and Shoshone's undertakings necessarily implies such a continuance ... The record is clear in this case: The parties obviously expected that Shoshone would continue purchasing electric power from Tri–State throughout the term of the contract as long as Shoshone had sufficient members requiring electric power. If Shoshone is able to eliminate its requirements by simply transferring its member subscriptions to Pacific, the contract cannot be carried out in the way it was expected. If Shoshone puts itself in a position in which it cannot carry out the all-requirements contract, it breaches the contract ... [I]t is quite clear from the all-requirements contract that the *requirements of Shoshone's members* were the subject matter of the parties' contract and within the parties' contemplation at the time of contracting. Those members have not ceased to have electric power requirement; Shoshone is merely transferring its members' requirements to Pacific.

*Id.* at 1357–1358.

And, in a footnote, the court noted:

In this case the very purpose behind forming the cooperative Tri–State system to provide electric power to rural users at a reasonable cost is obviously undercut if Tri–State raises the rates charged to its members simply to take into account the possibility that the members will sell out and have no requirements. Also, the rationale stated undercuts the cooperative, nonprofit nature of the Whole Tri–State system.

*Id.* at 1359, n. 14. Similarly, in this case, the very purpose behind forming the Wakefern cooperative was to combine the purchasing of the members to obtain lower wholesale costs. Even if the Tender/Independent Scenario was not specifically provided for in the Stockholders' Agreement, this court follows the reasoning of the court in *Shoshone* and finds that each member of Wakefern is required to live up to its obligations—i.e., to continue purchasing 85% of its requirements from Wakefern for a period not less then ten years, and if not, to compensate remaining members who bear the economic burden associated with a withdrawing member.

### (iii) Implied Covenant of Good Faith and Fair Dealing

 Under New Jersey law every contract contains an implied covenant of good faith and fair dealing. *Sons of Thunder, Inc. v. Borden, Inc.,* 148 N.J. 396, 690 A.2d 575 (1997). The implied covenant of good faith and fair dealing means that parties to a contract have an obligation to conduct their business honestly. *Id.* (citing to New Jersey's Uniform Commercial Code at N.J. Stat. Ann. 12A:1–201). According to the Supreme Court of New Jersey, each contracting party is to avoid doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing." *Sons of Thunder, Inc.,* 690 A.2d at 587 (quoting *Palisades Properties, Inc. v. Brunetti,* 44 N.J. 117, 130, 207 A.2d 522 (1965)).

 The purpose of the implied duty of good faith and fair dealing is to ensure that the reasonable expectations of the parties to an agreement are met. Accordingly, parties can violate the implied covenant of good faith and fair dealing while rightfully exercising their rights under their agreements. *Sons of Thunder, Inc.,* 690 A.2d at 586, 589. The Supreme Court of New Jersey has made clear that the determining factor in deciding whether parties have breached the implied cove-

nant is the inappropriate conduct of parties in performing their contracts.

■ As previously discussed, Wakefern and the members of the cooperative, including Big V, intended to avoid repeating the devastating economic effect caused by Pathmark's previous withdrawal from the cooperative. Accordingly, the reasonable expectations of all parties, especially Wakefern's, had been that a member's premature departure from the cooperative would trigger its obligation to pay a withdrawal fee. The main purpose of the withdrawal fee has been to preserve the cooperative. Big V has known from day one that its departure, coupled with its nonpayment of the fee, would jeopardize the economic stability of the cooperative. It would breach the implied covenant of good faith and fair dealings if Big V were to depart Wakefern as proposed without the withdrawal payment.

**4. Minimum Patronization Requirement**

Big V maintains that the requirement in Section 1.1 of the Stockholders' Agreement that each member purchase 85% of its goods from Wakefern does not apply to a party that has tendered its shares and is no longer a Wakefern stockholder. The court finds that the minimum patronization requirement and the withdrawal payment obligations are mutually exclusive. If one is obligated for the withdrawal payment, one cannot be liable for the minimum patronization requirement. Wakefern, apparently, agrees that it is either one or the other, not both. Since the court concludes that Big V cannot avoid the withdrawal payment by tendering its shares and transitioning to a new supplier, the court need not address the minimum patronization requirement.

## CONCLUSION

The court holds that Big V's proposal to tender its shares in Wakefern and transition to a new supplier is one step in a series of related transactions leading to the sale of Big V's ShopRite supermarket business or of a controlling interest in Big V. Alternatively, the tender of shares and abandonment of the ShopRite name and private label products constitutes a sale or other disposition of Big V's ShopRite supermarket business for value. Even if the Stockholders' Agreement fails to specifically identify Big V's proposal as an event of withdrawal, it was clearly intended by the parties to be such, and the court finds that Big V's Tender/Independent Scenario is an event of withdrawal under the Stockholders' Agreement and would breach the implied covenant of good faith and fair dealing.

For each of the foregoing reasons, Big V would be obligated for the withdrawal payment under the Stockholders' Agreement. Plaintiff has failed to meet its burden of proof under the Declaratory Judgment Act that its interpretation of the contract is correct. Judgment is in favor of the defendant has already been entered.